**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, CA 92626
Telephone: (800) 400-6808
Facsimile:  (800) 520-5523

**HYDE & SWIGART**
Joshua B. Swigart, Esq. (SBN: 225557)
josh@westcoastlitigation.com
2221 Camino Del Rio South, Suite 101
San Diego, CA 92108
Telephone: (619) 233-7770
Facsimile:  (619) 297-1022

[Additional Counsel for Plaintiff on Signature Page]

*Attorneys for Plaintiff,*
Thomas Abrahamian

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THOMAS ABRAHAMIAN, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,** <br><br> Plaintiff, <br><br> v. <br><br> **NATIONAL FOOTBALL LEAGUE, INC.; NFL ENTERPRISES LLC; DIRECTV, LLC; DIRECTV SPORTS NETWORKS LLC** <br><br> Defendants. | **Case No.:** <br><br> **CLASS ACTION COMPLAINT FOR DAMAGES, RESTITUTION AND INJUNCTIVE RELIEF FOR VIOLATIONS OF:** <br><br> **1.) SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1** <br><br> **2.) SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2** <br><br> **JURY TRIAL DEMANDED** |

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

**INTRODUCTION**

1. The National Football League ("NFL" or "League") is comprised of thirty-two separately owned and operated major league men's professional football clubs in the United States. The NFL member clubs have structured their governance to permit major decisions regarding on-field sporting competition and off-field business competition to be made by the team owners themselves. In so doing, the owners act in their own economic self-interest, including entering into a series of agreements that eliminate, restrict, and prevent off-field competition. These anticompetitive agreements go far beyond any cooperation reasonably necessary to provide major league men's professional football contests that increase fan appeal or respond to consumer preferences.

2. This action challenges, and seeks to remedy, the Defendants' agreements to eliminate competition in the distribution of live men's football games over television. The Defendants have accomplished this elimination of competition by agreeing to divide the live-game video presentation market into exclusive territories, which are protected by anti-competitive blackouts. Not only are such agreements not necessary to producing football contests, they are directed at reducing competition in the live-game video presentation market, involving and protecting third parties who operate only in that separate market.

3. In *American Needle, Inc. v. National Football League*, 130 S. Ct. 2201 (2010), the United States Supreme Court unanimously rejected the NFL's claim that an agreement regarding the joint marketing of club-owned intellectual property was the decision of a "single entity" – the league – not subject to section 1 of the Sherman Act. The Court reaffirmed lower court decisions that sports leagues are subject to the antitrust laws and that league owners must refrain from agreements that unreasonably restrain trade. The

Court also reaffirmed its own decision in *NCAA v. Board of Regents*, 468 U.S. 85 (1984), which held that the hallmark of an unreasonable restraint is one that raises price, lowers output, or renders output unresponsive to consumer preference.   The Court's decision extended a long line of precedents that recognize that sports leagues are subject to the antitrust laws. Indeed, the United States District Court for the Eastern District of Pennsylvania found several decades ago that television blackout agreements of the very kind at issue in this case amount to "an unreasonable and illegal restraint of trade." *United States v. Nat'l Football League*, 116 F. Supp. 319, 327 (E.D. Pa. 1953).

4.   Despite these clear precedents, the NFL teams continue to agree to divide the live-game video presentation market by assigning an exclusive territory to each team and its television partners.   In exchange for being granted anticompetitive protections in its own home market, the team and its partners expressly agree not to compete in the other teams' exclusive territories.   The stated purpose of these policies is to create regional monopolies that protect the partners from competition in their respective local areas.

5.   The only way consumers can watch video presentations of other teams is through an exclusive "out-of-market" package known as NFL Sunday Ticket, which is distributed only through DirecTV.

6.   In addition, the Defendants have colluded to sell this "out of market" package only through the League.   The League Defendants are then able to exploit their illegal monopoly by charging supra-competitive prices.   As a result of this monopoly, moreover, the League is able to require purchasers of NFL Sunday Ticket to buy all "out-of-market" games of all the League's teams even if the fan is only interested in a particular team or a particular game. Thus, a Cleveland Browns fan living in California cannot watch the Browns play, except occasional games on network television, unless he purchases the

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

entire package of League games from NFL Sunday Ticket.

7. As one set of commentators has put it, "Absent the exclusive territorial arrangements agreed to by league owners, individual teams would…arrange for their own games to be available out-of-market…Fans wishing to see only their favorite team now pay for more games than they want, so sports leagues are currently using their monopoly power to effectuate a huge wealth transfer.   Another significant group of less fanatic consumers would be willing to pay a more modest sum for their favorite teams' games only.  As to these fans, the current scheme reduces output."  Stephen F. Ross & Stefan Szymanski, Fans of the World Unite! (Stanford Univ. 2008).

8. These "exclusive" agreements and other competitive restraints are not reasonably necessary to maintain a level of competitive balance within the League that fans prefer, or to maintain the viability of franchises.  To the extent that competition among teams for television rights would result in revenue disparities that preclude a fan-optimal level of competitive balance, agreements that require revenue sharing, if set at levels that do not restrict output, is an obvious and well-recognized less restrictive alternative.

9. Plaintiff is an individual who was, and continues to be, harmed by the Defendants' anti-competitive agreements.  Plaintiff purchased an "out-of-market" package that is overpriced because of these unlawful agreements. Plaintiff seeks to restore off-field competition among and between the teams and their partners by ending the Defendants' collusive distribution agreements.

## JURISDICTION AND VENUE

10. Plaintiffs bring this action pursuant to Section 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.  This Court has subject matter jurisdiction over that claim pursuant to 28 U.S.C. §§ 1331 and 1337.

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

11. Venue is proper in the United States District Court, Central District of California pursuant to 28 U.S.C. § 1391 for the following reasons:

    (i)    Plaintiff resides in the County of Los Angeles, State of California which is within this judicial district;

    (ii)    The conduct complained of herein occurred within this judicial district as Plaintiff purchased NFL Sunday Ticket through DirecTV in this district;

    (iii)    Defendants conducted and do substantial business in the County of Los Angeles, State of California; and

    (iv)    Defendants are subject to personal jurisdiction in this district.

**PARTIES**

12. Plaintiff is, and at all times mentioned herein is, an individual citizen and resident of the County of Los Angeles, State of California. Plaintiff subscribed to NFL Sunday Ticket in July 2013, which he received through DirecTV satellite service. His DirecTV package also included other channels carrying live professional football games not available on a sponsored telecast. Plaintiff's favorite football team is the New England Patriots and he would prefer not to be required to purchase a full "out-of-market" package to get New England Patriots games. Plaintiff was charged supra-competitive prices for his service due to Defendants' conduct.

**A. The League Defendants**

13. Defendant National Football League, Inc. is an unincorporated association of the thirty-two major league men's professional football teams in the United States. Its headquarters are located at 345 Park Avenue, 7th Floor, New York, New York.

14. Defendant NFL Enterprises LLC is a Delaware limited liability company with its principal place of business at 280 Park Avenue, 15th Floor, New York, New York.

**B. The NFL Member Club Defendants**

15. The member clubs of the NFL that are named as defendants are:

   a. Arizona Cardinals Football Club LLC is a Delaware limited liability company located at 8701 South Hardy Drive, Tempe, Arizona.

   b. The Chicago Bears Football Club, Inc. is a Delaware corporation located at 1000 Football Drive, Lake Forest, Illinois.

   c. Green Bay Packers, Inc. is a Wisconsin corporation located at 1265 Lombardi Avenue, Green Bay, Wisconsin.

   d. New York Football Giants, Inc. is a New York corporation located at Giants Stadium, 1925 Giants Drive, East Rutherford, New Jersey.

   e. The Detroit Lions, Inc. is a Michigan corporation located at 222 Republic Drive, Allen Park, Michigan.

   f. Houston NFL Holdings, LP (d/b/a "The Houston Texans LP") is a Delaware limited partnership located at Two NRG Park, Houston, Texas.

**C. Other NFL Member Clubs**

   a. Pro-Football, Inc. (d/b/a/ "The Washington Redskins") is a Maryland corporation located at 21300 Redskin Park Drive, Ashburn, Virginia.

   b. Philadelphia Eagles, LLC, is a Pennsylvania limited liability company located at NovaCare Complex, One NovaCare Way, Philadelphia, Pennsylvania.

   c. Pittsburgh Steelers Sports, Inc., is a Pennsylvania corporation located at 3400 South Water Street, Pittsburgh, Pennsylvania.

   d. The St. Louis Rams, LLC is a Delaware limited liability company located at One Rams Way, St. Louis, Missouri.

   e. Forty Niners Football Company LLC is a Delaware limited liability company located at 4949 Centennial Boulevard, Santa Clara, California.

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

f.  Cleveland Browns, LLC is an Ohio limited liability company located at 76 Lou Groza Boulevard, Berea, Ohio.

g.  Indianapolis Colts, Inc. is a Delaware corporation located at 7001 West 56th Street, Indianapolis, Indiana.

h.  Dallas Cowboys Football Club Ltd. is a Texas limited partnership located at One Cowboys Parkway, Irving, Texas.

i.  Kansas City Chiefs Football Club, Inc., is a Texas corporation located at One Arrowhead Drive, Kansas City, Missouri.

j.  Chargers Football Company, LLC (d/b/a "San Diego Chargers") is a California limited liability company located at 4020 Murphy Canyon, San Diego, California.

k.  PDB Sports, Ltd. (d/b/a "Denver Broncos Football Club") is a Colorado limited partnership located at 13655 Broncos Parkway, Englewood, Colorado.

l.  New York Jets LLC is a Delaware limited liability company located at 50 West 57th, 2nd Floor, New York, New York.

m.  New England Patriots LP is a Delaware limited partnership located at One Patriot Place, Foxborough, Massachusetts.

n.  The Oakland Raiders is a California limited partnership located at 1220 Harbor Bay Parkway, Alameda, California.

o.  Tennessee Football, Inc. (d/b/a "Tennessee Titans") is a Delaware corporation located at 460 Great Circle Road, Nashville, Tennessee.

p.  Buffalo Bills, LLC, is a Delaware limited liability company located at One Bills Drive, Orchard Park, New York.

q.  Minnesota Vikings Football, LLC is a Delaware limited liability company located at 9520 Viking Drive, Eden Prairie, Minnesota.

r.  Atlanta Falcons Football Club, LLC is a Georgia limited liability company located at 4040 Falcon Parkway, Flowery Branch, Georgia.

s.  Miami Dolphins Ltd. is a Florida limited partnership located at 347 Don Shula Drive, Miami Gardens, Florida.

t.  New Orleans Louisiana Saints, L.L.C. is a Texas limited liability company located at 5800 Airline Drive, Metairie, Louisiana.

u.  Cincinnati Bengals, Inc., is an Ohio corporation located at One Paul Brown Stadium, Cincinnati, Ohio.

v.  Football Northwest LLC (d/b/a "Seattle Seahawks") is a Washington limited liability company located at 12 Seahawks Way, Renton, Washington.

w.  Buccaneers Limited Partnership (d/b/a "Tampa Bay Buccaneers") is a Delaware limited partnership located at One Buccaneer Place, Tampa, Florida

x.  Panthers Football, LLC (d/b/a "Carolina Panthers") is a North Carolina limited liability company located at 800 South Mint Street, Charlotte, North Carolina.

y.  Jacksonville Jaguars, Ltd. is a Florida limited partnership located at 1 Everbank Field Drive, Jacksonville, Florida.

z.  Baltimore Ravens Limited Partnership is a Maryland limited partnership located at 1101 Russell Street, Baltimore, Maryland.

**D. The Television Defendants**

16. Defendant Directv, LLC, is a Delaware corporation whose principal place of business is 2230 East Imperial Highway, El Segundo, California.  Directv and its subsidiaries provide satellite television service throughout the United States.

17. Defendant Directv Sports Networks LLC, a wholly owned subsidiary controlled by Directv, is a Delaware limited liability company, whose principal place of business is 2230 East Imperial Highway, El Segundo, California.

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

## FACTUAL ALLEGATIONS

### A. The Anticompetitive Exclusive License Agreements

18. It has long been recognized that the NFL's teams, like the teams of all professional sports leagues, must cooperate to define, schedule, and produce league contests.  That limited cooperation is consistent with, and permissible under, the antitrust laws.  But the teams continue to exist as separate businesses with separate owners.  They retain significant autonomy and seek their own profits.  Thus, the teams compete in business matters that are separate and distinct from the facilitation of football games.

19. Pursuant to a series of agreements between and among Defendants, the League has obtained centralized control over distribution of live video programming of NFL games.  As described more fully below, as a result of these agreements, the teams have agreed not to compete in business matters related to the video presentation of live major league men's professional football games.

20. The majority of NFL football games are televised pursuant to contracts entered into by individual teams with separate entities, primarily regional sports networks ("RSNs").

21. A smaller number of presentations are produced pursuant to national agreements between the League and various national networks, including CBS, FOX, NBC, and ESPN.  The League also owns its own channel, the NFL Network, which televises nationally through certain cable and satellite providers.

### 1.    Regional Blackout System

22. At the core of Defendants' restraint of competition in the video programming market are the regional blackout agreements.  The result of these agreements is a classic, horizontal, geographical market division.  In the absence of a separate out-of-market package or a national telecast, a consumer of video

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

presentations of live major league football games is required to purchase the video presentations provided by the consumers' local team and its television partner.

23. Defendant DirecTV has joined the conspiracy by agreeing to enforce and maintain these anticompetitive restrictions.

24. In the absence of these restrictions, fans would have access to live video from teams through the United States.  The availability of multiple sources of major league professional football programming would result in competition among the Defendants, which would lower prices and increase choice for consumers.

## 2.  Implementation of the Blackout System Through Agreements Restraining Competition Among Sports Networks

25. The teams implement their system of exclusive territories through a system of agreements with regional networks.  These agreements require the networks to agree not to compete with other regional networks in the presentation of NFL football games.

26. The networks (and their corporate parents) agree to these requirements knowing that other networks must agree not to compete in their territories.  The result is a horizontal division of the market that is enforced by the horizontal agreement between the Defendants.

27. In each case, the local television network (and the entity that controls that network) agrees with the League and teams that it will not permit its presentations of the games to be shown in areas outside of its exclusive territory, knowing that other networks will likewise agree not to compete in their exclusive home territory.  The League and the network also agree that the network will not carry games of other teams outside their territory.

28. Regional Sports Networks (RSNs) enter agreements with multichannel video programming distributors (MVPDs), like Defendant DirecTV, to implement

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

the blackouts.   But for these agreements, the MVPDs would facilitate "foreign" RSN entry and other forms of competition.

29. The result is that each local network has a monopoly on live televised football games in its territory.  In certain cases, the outer areas of a team's territory may overlap with another team's or teams' territories, permitting a viewer to watch either team's games, if they are available, and subjecting the viewer to local blackouts of all such teams' games.

30. These express restrictions on competition have made local sports networks extremely valuable.   The Federal Communications Commission has repeatedly described RSNs as the clearest example of "must-have" channels because of their exclusive control of sports programming. *See, e.g., In re AT&T Servs., Inc.* FCC 11-168, 2011 WL 5534853, *3 (Nov. 10, 2011).  In holding FCC rules designed to ensure that RSNs are not used to unfairly harm competition in the MVPD market, the Court of Appeals for the District of Columbia Circuit agreed that this control of sports programming made RSNs " 'must have' and nonreplicable." *Cablevision Sys. Corp. v. FCC*, 649 F.3d 695, 702 (D.C. Cir. 2011).

31. These restrictions have the purpose and effect of creating a series of regional monopolies in order to increase the price that can be charged by the teams, the television networks, and television distributors like DirecTV.  Plaintiff and all purchasers of video programming that include these networks consequently pay higher prices for television services that include presentations of major league professional football games.

## B. "Out-of-Market" Packages

32. For a consumer to obtain games that are not available through a local cable or over-the-air, there is only one option which, as a consequence of agreements by and among the teams, is controlled by the League.  NFL Sunday Ticket is such a service that is available exclusively through DirecTV.

33. The NFL defines this product as an "out-of-market" package, and games from outside of a protected territory as "out-of-market" games. "In-market" and "out-of-market" are terms defined by reference to the anticompetitive geographical restrictions imposed by Defendants and their co-conspirators.

34. NFL Sunday Ticket is available by satellite exclusively through DirecTV. The price for the service, as of June 2015, is $251.94 for the season.

35. NFL Sunday Ticket games involving a team whose exclusive territory encompasses the viewer's location are blacked out from Sunday Ticket, regardless of whether the game is being held locally, and regardless of whether the game is available to the viewer through a different network. The sole reason for this restriction is the interference with competition.

36. The League and DirecTV offer NFL Sunday Ticket only as all-or-nothing. Purchasers of NFL Sunday Ticket must buy all out-of-market games for all teams even if they are only interested in watching the games of a particular team. Likewise, consumers must buy the complete season of games and may not purchase individual games.

37. Because the League is the only source of such programming, it is able to charge monopoly pricing and limit the choices available to consumers. The inevitable consequence is higher pricing, lower quality, less choice to consumers, and lower output.

## C. The Agreements Have Restrained Horizontal Competition and Have Had Anticompetitive Effects and Led to Consumer Harm

38. The above-described agreements have restrained horizontal competition between and among the NFL teams, together with their media partners, and the NFL, including in the commercial exploitation of video presentations of live games where the teams' media partners could, and would, compete with each other and with the NFL. In particular, in the absence of the exclusive licenses and other competitive restraints, NFL teams and their partners would

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

compete with each other in the presentation of their teams' games to a much greater extent than the limited opportunities that are now available.

39. The above-described agreements have adversely affected and substantially lessened competition in the relevant markets.  Output of presentations of live NFL games, as well as output of game highlights and footage, is lower, and prices are higher, than they would be in the absence of the agreements to restrict competition.

40. Competition by individual teams acting independently to exploit the distribution of their teams' games would produce consumer benefits, such as an increase in the availability of live video presentations over a wider range of media, including cable, the internet, and wireless devices.

41. The above-described agreements do not concern matters of league structure and do not concern any unique characteristic or need of football exhibitions. These anticompetitive restraints are not necessary to the exhibition of football and are not integral to the sport itself.

42. There are no legitimate, pro-competitive justifications for these exclusive license agreements and other competitive restraints, which have harmed consumers in various ways, including in the above-described ways.

### D. Plaintiff Has Suffered Antitrust Injury

43. Plaintiff has been overcharged for the video presentation of live NFL games.

44. Subscribers to pay television service with standard channel packages have been forced and will continue to be forced to overpay for their television service because of the inclusion of sports programming that commands supra-competitive pricing.  Subscribers suffer this overpayment even if they do not watch sports programming.

45. Subscribers to NFL Sunday Ticket have been forced and will continue to be forced to overpay for "out-of-market" games because of the lack of competition created by the geographical exclusivity system.

46. Individual teams and their media partners are restrained from distributing their games through cable, satellite, Internet, and otherwise in ways that they may determine are best suited to reaching their respective and potential fan bases throughout the country and abroad.

## CLASS ACTION ALLEGATIONS

47. Plaintiff and the members of the Class have all suffered injury in fact as a result of the Defendants' conduct.

48. The "Class Period" means four years prior to filing of the Complaint in this action.

49. Plaintiff brings this lawsuit on behalf of himself and other consumers similarly situated throughout the United States under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Subject to additional information obtained through further investigation and/or discovery, the proposed "Class" consists of:

> "All persons who purchased television service from DirecTV, or its subsidiaries, that included channels carrying video presentations of live NFL football games that were not available through a sponsored telecast, within four years prior to the filing of the Complaint in this action and until the effects of the anti-competitive conduct end."

Excluded from the Class are Defendants and any of their officers, directors, and employees. Plaintiff reserves the right to modify or amend the Class definition before the Court determines whether certification is appropriate.

50. *Ascertainability.* The members of the Class are readily ascertainable from Defendants' records and/or Defendants' agent's records regarding DirecTV subscriptions, as well as through public notice.

51. *Numerosity.* The members of the Class are so numerous that their individual joinder is impracticable. Plaintiff is informed and believes, and on that basis alleges, that the proposed class consists of hundreds of thousands of members,

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

if not millions.

52. ***Existence and Predominance of Common Questions of Law and Fact***. Common questions of law and fact exist as to all members of the Class predominate over any questions affecting only individual Class members. All members of the Class have been subject to the same conduct. The common legal and factual questions include, but are not limited to, the following:

    (a) Whether Defendants and their co-conspirators engaged in a contract, combination, or conspiracy among themselves to fix, raise, maintain or stabilize prices of NFL Sunday Ticket by preventing any competitor from offering competing products;

    (b) The effect of Defendants' conspiracy on the prices of NFL Sunday Ticket in the United States during the class period;

    (c) The effect of Defendants' conspiracy on the prices of pay television packages that include NFL football games that are not available on a sponsored telecast;

    (d) The identity of the participants of the conspiracy;

    (e) The duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

    (f) Whether the alleged conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

    (g) Whether the alleged conspiracy violated Section 2 of the Sherman Act, 15 U.S.C. § 2;

    (h) Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the Plaintiff and members of the Class; and

    (i) The appropriate class-wide measure of damages.

53. ***Typicality***. Plaintiff's claims are typical of the claims of the members of the

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

Class in that Plaintiff is a member of the Class that Plaintiff seek to represent. Plaintiff, like members of the proposed Class, was a subscriber to pay television service provided by DirecTV, which included channels carrying NFL football games that are not available on a sponsored telecast. Plaintiff was a subscriber to NFL Sunday Ticket as part of this service. Plaintiff is advancing the same claims and legal theories on behalf of himself and all absent members of the Class. Defendants have no defenses unique to the Plaintiff.

54. ***Adequacy of Representation***. Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained counsel experienced in consumer protection law, including class actions. Plaintiff has no adverse or antagonistic interest to those in the Class, and will fairly and adequately protect the interests of the Class. Plaintiff's attorneys are aware of no interests adverse or antagonistic to those of Plaintiff and proposed Class.

55. ***Superiority***. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. Individualized litigation would create the danger of inconsistent and/or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and court system and the issues raised by this action. The damages or other financial detriment suffered by individual Class members may be relatively small compared to the burden and expense that would be entailed by individual litigation of the claims against the Defendant. The injury suffered by each individual member of the proposed class is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the proposed Class to individually redress effectively the wrongs to them. Even if the members of the proposed Class could afford such litigation, the court

system could not. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Therefore, a class action is maintainable pursuant to Fed. R. Civ. P. 23(b)(3).

56. Unless the Class is certified, Defendants and their co-conspirators will retain monies received as a result of the Defendants' conduct alleged herein. Unless a class-wide injunction is issued, Defendants and their co-conspirators will also likely continue to engage in anti-competitive agreements, and members of the Class will continue to suffer injury as a result.

57. Further, Defendants have acted or refused to act on grounds that are generally applicable to the class so that declaratory and injunctive relief is appropriate to the Class as a whole, making class certification appropriate pursuant to Fed. R. Civ. P. 23(b)(2).

### FIRST CAUSE OF ACTION

### FOR VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT

### 15 U.S.C § 1

58. Plaintiff repeats, re-alleges and incorporates by reference the above allegations as if fully stated herein.

59. Plaintiff brings this cause of action on behalf of himself and on behalf of the putative Class.

60. Beginning at a time presently unknown to Plaintiff, and continuing through the present, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered into a continuing agreement, combination, or conspiracy in restraint of trade with the purpose, intent, and effect of restraining horizontal competition among the NFL teams and their television partners, and between the teams and the NFL, with the purpose, intent, and

effect of restraining trade and commerce in the distribution of major league professional football games, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

61. The contract, combination, or conspiracy has resulted in an agreement, understanding, or concerted action between and among the Defendants and their co-conspirators that the League will be the exclusive provider of live "out-of-market" games distributed through television providers. The Defendants and their co-conspirators have agreed that no club or network will offer a competing product, or make their programming available within another team's exclusive territory.

62. The contract, combination, or conspiracy has restrained competition between and among the Defendants in violation of Section 1 of the Sherman Act. It has led to anticompetitive effects in the relevant markets, as alleged above, and caused injury to consumers and competition in those relevant markets and elsewhere.

63. The Defendants' contract, combination, agreement, understanding, or concerted action with their co-conspirators occurred in or affected interstate commerce. The Defendants' unlawful conduct was through mutual understandings, combinations, or agreements by, between, and among the Defendants and other unnamed co-conspirators. These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

64. Defendants' anticompetitive conduct has directly and proximately caused antitrust injury, in the form of higher prices and reduced choice, as set forth above. Plaintiff and other consumers will continue to suffer antitrust injury and other damage unless Defendants are enjoined from continuing to engage in the foregoing violations of law.

//

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

## SECOND CAUSE OF ACTION

## FOR VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT

## 15 U.S.C § 2

65. Plaintiff repeats, re-alleges and incorporates by reference the above allegations as if fully stated herein.

66. Defendants and their co-conspirators, by the above-mentioned conduct, possess monopoly power over the market for video presentations of major league football games and have used that power for the purposes of unreasonably excluding and/or limiting competition, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  These activities have gone beyond those which could be considered as "legitimate business activities," and are an abuse of market position.

67. Through the anti-competitive conduct described herein, Defendants and their co-conspirators have willfully acquired and maintained, and unless restrained by the Court, will continue to willfully maintain, that monopoly power by anti-competitive and unreasonably exclusionary conduct.  Defendants and their co-conspirators have acted with an intent to illegally acquire and maintain that monopoloy power in the relevant product market, and their illegal conduct has enabled them to do so, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

68. Defendants' anticompetitive conduct has directly and proximately caused antitrust injury, as set forth above.  Plaintiff and other consumers will continue to suffer antitrust injury and other damage unless Defendants are enjoined from continuing to engage in the foregoing violations of law.

//

//

//

//

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendant, and that Plaintiff and Class members be awarded damages from Defendants as follows:

- That this action be certified as a Class Action, Plaintiff be appointed as the representative of the Class, and Plaintiff's attorneys be appointed Class counsel;

- That the contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged in this Complaint, be adjudged to have been a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

- That the Defendants' and their co-conspirators' actions to illegally acquire and maintain monopoly power in the relevant product market, be adjudged to have been a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

- That judgment be entered for Plaintiff and members of the Class against Defendants for three times the amount of damages sustained by Plaintiff and the members of the Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26;

- That Plaintiff and the Class be awarded pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

- That Defendants and their co-conspirators be enjoined from further violations of the antitrust laws;

- Distribution of any monies recovered on behalf of members of the Class via fluid recovery or *cy pres* recovery where necessary and as applicable, to prevent Defendants from retaining the benefits of their wrongful

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

conduct; and

- That Plaintiff and members of the Class have such other, further or different relief, as the case may require and the Court may deem just and proper under the circumstances.

Dated: June 17, 2015                    Respectfully submitted,

                              **KAZEROUNI LAW GROUP, APC**


                              By: _s/ ABBAS KAZEROUNIAN_____
                                      ABBAS KAZEROUNIAN, ESQ.
                                      ATTORNEYS FOR PLAINTIFF

## TRIAL BY JURY

69.  Pursuant to the Seventh Amendment to the Constitution of the United States of America, Plaintiff is entitled to, and demands, a trial by jury.

Dated: June 17, 2015                    Respectfully submitted,

                              **KAZEROUNI LAW GROUP, APC**


                              By: _s/ ABBAS KAZEROUNIAN_____
                                      ABBAS KAZEROUNIAN, ESQ.
                                      ATTORNEYS FOR PLAINTIFF