1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
Gouya Ranekouhi, Esq. (SBN: 288267)
gouya@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, CA 92626
Telephone: (800) 400-6808
Facsimile:  (800) 520-5523

[Additional Counsel for Plaintiffs on Signature Page]

*Attorneys for Plaintiffs,*
Thomas Abrahamian and Mario Aliano

KAZEROUNI LAW GROUP, APC
245 Fischer Avenue, Unit D1
Costa Mesa, California

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THOMAS ABRAHAMIAN;  AND MARIO ALIANO; INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,**<br><br>Plaintiffs,<br><br>v.<br><br>**NATIONAL FOOTBALL LEAGUE, INC.; NFL ENTERPRISES LLC; DIRECTV, LLC; AND DIRECTV SPORTS NETWORKS LLC,**<br><br>Defendants. | **Lead Case No.:**  2:15-cv-04606-BRO-JEM<br><br>**CASE CONSOLIDATED WITH: 2:15-CV-05508-BRO-JEM**<br><br>**CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, RESTITUTION AND INJUNCTIVE RELIEF FOR VIOLATIONS OF:**<br><br>1.) **SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1**<br><br>2.) **SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1. The National Football League ("NFL" or "League") is comprised of thirty-two separately owned and operated major league men's professional football clubs in the United States.   The NFL member clubs have structured their governance to permit major decisions regarding on-field sporting competition and off-field business competition to be made by the team owners themselves. In so doing, the owners act in their own economic self-interest, including entering into a series of agreements that eliminate, restrict, and prevent off-field competition.   These anticompetitive agreements go far beyond any cooperation reasonably necessary to provide major league men's professional football contests that increase fan appeal or respond to consumer preferences.

2. This action challenges, and seeks to remedy, the Defendants' agreements to eliminate competition in the distribution of live men's football games over television.   The Defendants have accomplished this elimination of competition by agreeing to divide the live-game video presentation market into exclusive territories, which are protected by anti-competitive blackouts. Not only are such agreements not necessary to producing football contests, they are directed at reducing competition in the live-game video presentation market, involving and protecting third parties who operate only in that separate market.

3. In *American Needle, Inc. v. National Football League*, 130 S. Ct. 2201 (2010), the United States Supreme Court unanimously rejected the NFL's claim that an agreement regarding the joint marketing of club-owned intellectual property was the decision of a "single entity" – the league – not subject to section 1 of the Sherman Act.  The Court reaffirmed lower court decisions that sports leagues are subject to the antitrust laws and that league owners must refrain from agreements that unreasonably restrain trade.   The Court also reaffirmed its own decision in *NCAA v. Board of Regents*, 468 U.S. 85 (1984),

KAZEROUNI LAW GROUP, APC
245 Fischer Avenue, Unit D1
Costa Mesa, California

Kazerouni Law Group, APC
245 Fischer Avenue, Unit D1
Costa Mesa, California

which held that the hallmark of an unreasonable restraint is one that raises price, lowers output, or renders output unresponsive to consumer preference. The Court's decision extended a long line of precedents that recognize that sports leagues are subject to the antitrust laws.   Indeed, the United States District Court for the Eastern District of Pennsylvania found several decades ago that television blackout agreements of the very kind at issue in this case amount to "an unreasonable and illegal restraint of trade." *United States v. Nat'l Football League*, 116 F. Supp. 319, 327 (E.D. Pa. 1953).

4.   Despite these clear precedents, the NFL teams continue to agree to divide the live-game video presentation market by assigning an exclusive territory to each team and its television partners.   In exchange for being granted anticompetitive protections in its own home market, the team and its partners expressly agree not to compete in the other teams' exclusive territories.   The stated purpose of these policies is to create regional monopolies that protect the partners from competition in their respective local areas.

5.   The only way consumers can watch video presentations of other teams is through an exclusive "out-of-market" package known as NFL Sunday Ticket, which is distributed only through DirecTV.

6.   In addition, the Defendants have colluded to sell this "out of market" package only through the League.   The League Defendants are then able to exploit their illegal monopoly by charging supra-competitive prices.   As a result of this monopoly, moreover, the League is able to require purchasers of NFL Sunday Ticket to buy all "out-of-market" games of all the League's teams even if the fan is only interested in a particular team or a particular game. Thus, a Cleveland Browns fan living in California cannot watch the Browns play, except occasional games on network television, unless he purchases the entire package of League games from NFL Sunday Ticket.

7. As one set of commentators has put it, "Absent the exclusive territorial arrangements agreed to by league owners, individual teams would…arrange for their own games to be available out-of-market…Fans wishing to see only their favorite team now pay for more games than they want, so sports leagues are currently using their monopoly power to effectuate a huge wealth transfer. Another significant group of less fanatic consumers would be willing to pay a more modest sum for their favorite teams' games only.  As to these fans, the current scheme reduces output."  Stephen F. Ross & Stefan Szymanski, <u>Fans of the World Unite!</u> (Stanford Univ. 2008).

8. These "exclusive" agreements and other competitive restraints are not reasonably necessary to maintain a level of competitive balance within the League that fans prefer, or to maintain the viability of franchises.  To the extent that competition among teams for television rights would result in revenue disparities that preclude a fan-optimal level of competitive balance, agreements that require revenue sharing, if set at levels that do not restrict output, is an obvious and well-recognized less restrictive alternative.

9. Plaintiffs are individuals who were, and continue to be, harmed by the Defendants' anti-competitive agreements.  Plaintiffs purchased an "out-of-market" package that is overpriced because of these unlawful agreements. Plaintiffs seek to restore off-field competition among and between the teams and their partners by ending the Defendants' collusive distribution agreements.

## JURISDICTION AND VENUE

10. Plaintiffs bring this action pursuant to Section 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.  This Court has subject matter jurisdiction over that claim pursuant to 28 U.S.C. §§ 1331 and 1337.

KAZEROUNI LAW GROUP, APC
245 Fischer Avenue, Unit D1
Costa Mesa, California

11. Venue is proper in the United States District Court, Central District of California pursuant to 28 U.S.C. § 1391 for the following reasons:

    (i)     Plaintiff Abrahamian resides in the County of Los Angeles, State of California which is within this judicial district;

    (ii)     The conduct complained of herein occurred within this judicial district as Plaintiff Abrahamian purchased NFL Sunday Ticket through DirecTV in this district;

    (iii)     Defendants conducted and do substantial business in the County of Los Angeles, State of California; and

    (iv)     Defendants are subject to personal jurisdiction in this district.

## PARTIES

12. Plaintiff Abrahamian is, and at all times mentioned herein was, an individual citizen and resident of the County of Los Angeles, State of California. Plaintiff Abrahamian subscribed to NFL Sunday Ticket in July 2013, which he received through DirecTV satellite service. His DirecTV package also included other channels carrying live professional football games not available on a sponsored telecast. Plaintiff Abrahamian's favorite football team is the New England Patriots and he would prefer not to be required to purchase a full "out-of-market" package to get New England Patriots games. Plaintiff Abrahamian was charged supra-competitive prices for his service due to Defendants' conduct.

13. Plaintiff Aliano is a resident of Illinois. Plaintiff subscribed to NFL Sunday Ticket in 2015, which he received through DirecTV satellite service. His DirecTV package also included other channels carrying live professional football games not available on a sponsored telecast. Plaintiff Aliano's favorite football team is the New Orleans Saints and he would prefer not to be required to purchase a full "out-of-market" package to get New Orleans Saints games. Plaintiff Aliano was charged supra-competitive prices for his service due to Defendants' conduct.

**A.    The League Defendants**

14. Defendant National Football League, Inc. is an unincorporated association of the thirty-two major league men's professional football teams in the United States.  Its headquarters are located at 345 Park Avenue, 7th Floor, New York, New York.

15. Defendant NFL Enterprises LLC is a Delaware limited liability company with its principal place of business at 280 Park Avenue, 15th Floor, New York, New York.

**B.    The Television Defendants**

16. Defendant DirecTV, LLC ("DirecTV"), is a Delaware limited liability company, whose principal place of business is 2230 East Imperial Highway, El Segundo, California.  DirecTV and its subsidiaries provide satellite television service throughout the United States.

17. Defendant DirecTV Sports Networks LLC, a wholly owned subsidiary controlled by DirecTV, is a Delaware limited liability company, whose principal place of business is 2230 East Imperial Highway, El Segundo, California.

FACTUAL ALLEGATIONS

**A.    The Anticompetitive Exclusive License Agreements**

18. It has long been recognized that the NFL's teams, like the teams of all professional sports leagues, must cooperate to define, schedule, and produce league contests.  That limited cooperation is consistent with, and permissible under, the antitrust laws.   But the teams continue to exist as separate businesses with separate owners.  They retain significant autonomy and seek their own profits.   Thus, the teams compete in business matters that are separate and distinct from the facilitation of football games.

19. Pursuant to a series of agreements between and among Defendants, the League has obtained centralized control over distribution of live video programming of NFL games.  As described more fully below, as a result of

KAZEROUNI LAW GROUP, APC
245 Fischer Avenue, Unit D1
Costa Mesa, California

1  these agreements, the teams have agreed not to compete in business matters
2  related to the video presentation of live major league men's professional
3  football games.

4  //

5  20. The majority of NFL football games are televised pursuant to contracts
6      entered into by individual teams with separate entities, primarily regional
7      sports networks ("RSNs").

8  21. A smaller number of presentations are produced pursuant to national
9      agreements between the League and various national networks, including
10     CBS, FOX, NBC, and ESPN.  The League also owns its own channel, the
11     NFL Network, which televises nationally through certain cable and satellite
12     providers.

13                    **1.     Regional Blackout System**

14 22. At the core of Defendants' restraint of competition in the video programming
15     market are the regional blackout agreements.  The result of these agreements
16     is a classic, horizontal, geographical market division.   In the absence of a
17     separate out-of-market package or a national telecast, a consumer of video
18     presentations of live major league football games is required to purchase the
19     video presentations provided by the consumers' local team and its television
20     partner.

21 23. Defendant DirecTV has joined the conspiracy by agreeing to enforce and
22     maintain these anticompetitive restrictions.

23 24. In the absence of these restrictions, fans would have access to live video from
24     teams through the United States.  The availability of multiple sources of major
25     league professional football programming would result in competition among
26     the Defendants, which would lower prices and increase choice for consumers.

27 ///

28 ///

KAZEROUNI LAW GROUP, APC
245 Fischer Avenue, Unit D1
Costa Mesa, California

---

2.    **Implementation of the Blackout System Through Agreements Restraining Competition Among Sports Networks**

25. The teams implement their system of exclusive territories through a system of agreements with regional networks.  These agreements require the networks to agree not to compete with other regional networks in the presentation of NFL football games.

26. The networks (and their corporate parents) agree to these requirements knowing that other networks must agree not to compete in their territories.  The result is a horizontal division of the market that is enforced by the horizontal agreement between the Defendants.

27. In each case, the local television network (and the entity that controls that network) agrees with the League and teams that it will not permit its presentations of the games to be shown in areas outside of its exclusive territory, knowing that other networks will likewise agree not to compete in their exclusive home territory.  The League and the network also agree that the network will not carry games of other teams outside their territory.

28. RSNs enter into agreements with multichannel video programming distributors ("MVPDs"), like Defendant DirecTV, to implement the blackouts.  But for these agreements, the MVPDs would facilitate "foreign" RSN entry and other forms of competition.

29. The result is that each local network has a monopoly on live televised football games in its territory.  In certain cases, the outer areas of a team's territory may overlap with another team's or teams' territories, permitting a viewer to watch either team's games, if they are available, and subjecting the viewer to local blackouts of all such teams' games.

30. These express restrictions on competition have made local sports networks extremely valuable.  The Federal Communications Commission has repeatedly described RSNs as the clearest example of "must-have" channels because of their

KAZEROUNI LAW GROUP, APC
245 Fischer Avenue, Unit D1
Costa Mesa, California

exclusive control of sports programming. *See, e.g., In re AT&T Servs., Inc.* FCC 11-168, 2011 WL 5534853, *3 (Nov. 10, 2011). In holding FCC rules designed to ensure that RSNs are not used to unfairly harm competition in the MVPD market, the Court of Appeals for the District of Columbia Circuit agreed that this control of sports programming made RSNs " 'must have' and nonreplicable." *Cablevision Sys. Corp. v. FCC*, 649 F.3d 695, 702 (D.C. Cir. 2011).

31. These restrictions have the purpose and effect of creating a series of regional monopolies in order to increase the price that can be charged by the teams, the television networks, and television distributors like DirecTV. Plaintiffs and all purchasers of video programming that include these networks consequently pay higher prices for television services that include presentations of major league professional football games.

### B.   <u>"Out-of-Market" Packages</u>

32. For a consumer to obtain games that are not available through a local cable or over-the-air, there is only one option which, as a consequence of agreements by and among the teams, is controlled by the League. NFL Sunday Ticket is such a service that is available exclusively through DirecTV.

33. The NFL defines this product as an "out-of-market" package, and games from outside of a protected territory as "out-of-market" games. "In-market" and "out-of-market" are terms defined by reference to the anticompetitive geographical restrictions imposed by Defendants and their co-conspirators.

34. NFL Sunday Ticket is available by satellite exclusively through DirecTV. The price for the service, as of June, 2015, is $251.94 for the season.

35. NFL Sunday Ticket games involving a team whose exclusive territory encompasses the viewer's location are blacked out from Sunday Ticket, regardless of whether the game is being held locally, and regardless of whether the game is available to the viewer through a different network. The sole reason for this restriction is the interference with competition.

KAZEROUNI LAW GROUP, APC
245 Fischer Avenue, Unit D1
Costa Mesa, California

36. The League and DirecTV offer NFL Sunday Ticket only as all-or-nothing. Purchasers of NFL Sunday Ticket must buy all out-of-market games for all teams even if they are only interested in watching the games of a particular team.  Likewise, consumers must buy the complete season of games and may not purchase individual games.

37. Because the League is the only source of such programming, it is able to charge monopoly pricing and limit the choices available to consumers.  The inevitable consequence is higher pricing, lower quality, less choice to consumers, and lower output.

## C.    **The Agreements Have Restrained Horizontal Competition and Have Had Anticompetitive Effects and Led to Consumer Harm**

38. The above-described agreements have restrained horizontal competition between and among the NFL teams, together with their media partners, and the NFL, including in the commercial exploitation of video presentations of live games where the teams' media partners could, and would, compete with each other and with the NFL.  In particular, in the absence of the exclusive licenses and other competitive restraints, NFL teams and their partners would compete with each other in the presentation of their teams' games to a much greater extent than the limited opportunities that are now available.

39. The above-described agreements have adversely affected and substantially lessened competition in the relevant markets.  Output of presentations of live NFL games, as well as output of game highlights and footage, is lower, and prices are higher, than they would be in the absence of the agreements to restrict competition.

40. Competition by individual teams acting independently to exploit the distribution of their teams' games would produce consumer benefits, such as an increase in the availability of live video presentations over a wider range of media, including cable, the internet, and wireless devices.

KAZEROUNI LAW GROUP, APC
245 Fischer Avenue, Unit D1
Costa Mesa, California

41. The above-described agreements do not concern matters of league structure and do not concern any unique characteristic or need of football exhibitions. These anticompetitive restraints are not necessary to the exhibition of football and are not integral to the sport itself.

42. There are no legitimate, pro-competitive justifications for these exclusive license agreements and other competitive restraints, which have harmed consumers in various ways, including in the above-described ways.

**D.    Plaintiffs Have Suffered Antitrust Injury**

43. Plaintiffs have been overcharged for the video presentation of live NFL games.

44. Subscribers to pay television service with standard channel packages have been forced and will continue to be forced to overpay for their television service because of the inclusion of sports programming that commands supra-competitive pricing.  Subscribers suffer this overpayment even if they do not watch sports programming.

45. Subscribers to NFL Sunday Ticket have been forced and will continue to be forced to overpay for "out-of-market" games because of the lack of competition created by the geographical exclusivity system.

46. Individual teams and their media partners are restrained from distributing their games through cable, satellite, internet, and otherwise in ways that they may determine are best suited to reaching their respective and potential fan bases throughout the country and abroad.

**CLASS ACTION ALLEGATIONS**

47. Plaintiffs and the members of the Class have all suffered injury in fact as a result of the Defendants' conduct.

48. The "Class Period" means four years prior to filing of the Complaint in this action.

///

---

**CONSOLIDATED SECOND AMENDED COMPLAINT**                    PAGE 11 OF 19

49. Plaintiffs bring this lawsuit on behalf of themselves and other consumers similarly situated throughout the United States under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.   Subject to additional information obtained through further investigation and/or discovery, the proposed "Class" consists of:

> "All persons who purchased television service from DirecTV, or its subsidiaries, that included channels carrying video presentations of live NFL football games that were not available through a sponsored telecast, within four years prior to the filing of the Complaint in this action and until the effects of the anti-competitive conduct end."

Excluded from the Class are Defendants and any of their officers, directors, and employees.   Plaintiffs reserve the right to modify or amend the Class definition before the Court determines whether certification is appropriate.

50. *Ascertainability.* The members of the Class are readily ascertainable from Defendants' records and/or Defendants' agent's records regarding DirecTV subscriptions, as well as through public notice.

51. *Numerosity*. The members of the Class are so numerous that their individual joinder is impracticable. Plaintiffs are informed and believe, and on that basis allege, that the proposed class consists of hundreds of thousands of members, if not millions.

52. *Existence and Predominance of Common Questions of Law and Fact*. Common questions of law and fact exist as to all members of the Class predominate over any questions affecting only individual Class members. All members of the Class have been subject to the same conduct. The common legal and factual questions include, but are not limited to, the following:

> (a)   Whether Defendants and their co-conspirators engaged in a

KAZEROUNI LAW GROUP, APC
245 Fischer Avenue, Unit D1
Costa Mesa, California

contract, combination, or conspiracy among themselves to fix, raise, maintain or stabilize prices of NFL Sunday Ticket by preventing any competitor from offering competing products;

(b) The effect of Defendants' conspiracy on the prices of NFL Sunday Ticket in the United States during the class period;

(c) The effect of Defendants' conspiracy on the prices of pay television packages that include NFL football games that are not available on a sponsored telecast;

(d) The identity of the participants of the conspiracy;

(e) The duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

(f) Whether the alleged conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

(g) Whether the alleged conspiracy violated Section 2 of the Sherman Act, 15 U.S.C. § 2;

(h) Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the Plaintiffs and members of the Class; and

(i) The appropriate Class-wide measure of damages.

53. ***Typicality***. Plaintiffs' claims are typical of the claims of the members of the Class in that Plaintiffs are members of the Class that Plaintiffs seek to represent. Plaintiffs, like members of the proposed Class, were subscribers to pay television service provided by DirecTV, which included channels carrying NFL football games that are not available on a sponsored telecast.  Plaintiffs were subscribers to NFL Sunday Ticket as part of this service. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all absent members of the Class. Defendants have no defenses unique to the

Plaintiffs.

54. ***Adequacy of Representation***. Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel experienced in consumer protection law, including class actions. Plaintiffs have no adverse or antagonistic interest to those in the Class, and will fairly and adequately protect the interests of the Class. Plaintiffs' attorneys are aware of no interests adverse or antagonistic to those of Plaintiffs and the proposed Class.

55. ***Superiority***. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. Individualized litigation would create the danger of inconsistent and/or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and court system and the issues raised by this action. The damages or other financial detriment suffered by individual Class members may be relatively small compared to the burden and expense that would be entailed by individual litigation of the claims against the Defendants. The injury suffered by each individual member of the proposed class is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the proposed Class to individually redress effectively the wrongs to them. Even if the members of the proposed Class could afford such litigation, the court system could not. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Therefore, a class action is maintainable pursuant to Fed. R. Civ. P. 23(b)(3).

KAZEROUNI LAW GROUP, APC
245 Fischer Avenue, Unit D1
Costa Mesa, California

56. Unless the Class is certified, Defendants and their co-conspirators will retain monies received as a result of the Defendants' conduct alleged herein. Unless a class-wide injunction is issued, Defendants and their co-conspirators will also likely continue to engage in anti-competitive agreements, and members of the Class will continue to suffer injury as a result.

57. Further, Defendants have acted or refused to act on grounds that are generally applicable to the class so that declaratory and injunctive relief is appropriate to the Class as a whole, making class certification appropriate pursuant to Fed. R. Civ. P. 23(b)(2).

**FIRST CAUSE OF ACTION**
**FOR VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT**
**15 U.S.C § 1**

58. Plaintiffs repeat, re-allege and incorporate by reference the above allegations as if fully stated herein.

59. Plaintiffs bring this cause of action on behalf of themselves and on behalf of the putative Class.

60. Beginning at a time presently unknown to Plaintiffs, and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, combination, or conspiracy in restraint of trade with the purpose, intent, and effect of restraining horizontal competition among the NFL teams and their television partners, and between the teams and the NFL, with the purpose, intent, and effect of restraining trade and commerce in the distribution of major league professional football games, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

61. The contract, combination, or conspiracy has resulted in an agreement, understanding, or concerted action between and among the Defendants and their co-conspirators that the League will be the exclusive provider of live "out-of-market" games distributed through television providers. The

KAZEROUNI LAW GROUP, APC
245 Fischer Avenue, Unit D1
Costa Mesa, California

Defendants and their co-conspirators have agreed that no club or network will offer a competing product, or make their programming available within another team's exclusive territory.

62. The contract, combination, or conspiracy has restrained competition between and among the Defendants in violation of Section 1 of the Sherman Act.  It has led to anticompetitive effects in the relevant markets, as alleged above, and caused injury to consumers and competition in those relevant markets and elsewhere.

63. The Defendants' contract, combination, agreement, understanding, or concerted action with their co-conspirators occurred in or affected interstate commerce.   The Defendants' unlawful conduct was through mutual understandings, combinations, or agreements by, between, and among the Defendants and other unnamed co-conspirators.  These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

64. Defendants' anticompetitive conduct has directly and proximately caused antitrust injury, in the form of higher prices and reduced choice, as set forth above.  Plaintiffs and other consumers will continue to suffer antitrust injury and other damage unless Defendants are enjoined from continuing to engage in the foregoing violations of law.

## SECOND CAUSE OF ACTION
## FOR VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT
## 15 U.S.C § 2

65. Plaintiffs repeat, re-allege and incorporate by reference the above allegations as if fully stated herein.

66. Defendants and their co-conspirators, by the above-mentioned conduct, possess monopoly power over the market for video presentations of major league football games and have used that power for the purposes of unreasonably excluding and/or limiting competition, in violation of Section 2

KAZEROUNI LAW GROUP, APC
245 Fischer Avenue, Unit D1
Costa Mesa, California

KAZEROUNI LAW GROUP, APC
245 Fischer Avenue, Unit D1
Costa Mesa, California

of the Sherman Act, 15 U.S.C. § 2.  These activities have gone beyond those which could be considered as "legitimate business activities," and are an abuse of market position.

67. Through the anti-competitive conduct described herein, Defendants and their co-conspirators have willfully acquired and maintained, and unless restrained by the Court, will continue to willfully maintain, that monopoly power by anti-competitive and unreasonably exclusionary conduct.  Defendants and their co-conspirators have acted with an intent to illegally acquire and maintain that monopoly power in the relevant product market, and their illegal conduct has enabled them to do so, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

68. Defendants' anticompetitive conduct has directly and proximately caused antitrust injury, as set forth above.   Plaintiffs and other consumers will continue to suffer antitrust injury and other damage unless Defendants are enjoined from continuing to engage in the foregoing violations of law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants, and that Plaintiffs and Class members be awarded damages from Defendants as follows:

- That this action be certified as a Class Action, Plaintiffs be appointed as the representatives of the Class, and Plaintiffs' attorneys be appointed Class counsel;

- That the contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged in this Complaint, be adjudged to have been a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

- That the Defendants' and their co-conspirators' actions to illegally acquire and maintain monopoly power in the relevant product market, be

adjudged to have been a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

- That judgment be entered for Plaintiffs and members of the Class against Defendants for three times the amount of damages sustained by Plaintiffs and the members of the Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26;

- That Plaintiffs and the Class be awarded pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

- That Defendants and their co-conspirators be enjoined from further violations of the antitrust laws;

- Distribution of any monies recovered on behalf of members of the Class via fluid recovery or *cy pres* recovery where necessary and as applicable, to prevent Defendants from retaining the benefits of their wrongful conduct; and

- That Plaintiffs and members of the Class have such other, further or different relief, as the case may require and the Court may deem just and proper under the circumstances.

### TRIAL BY JURY

69. Pursuant to the Seventh Amendment to the Constitution of the United States of America, Plaintiffs are entitled to, and demand, a trial by jury.

Respectfully submitted on this 3rd day of September, 2015.

KAZEROUNI LAW GROUP, APC

By:  /s/ Abbas Kazerounian
    Abbas Kazerounian
    Attorney for Plaintiffs

**[Additional Plaintiffs' Counsel]**

**HYDE & SWIGART**
Joshua B. Swigart, Esq. (SBN: 225557)
josh@westcoastlitigation.com
Sara Khosroabadi, Esq. (SBN: 299642)
sara@westcoastlitigation.com
2221 Camino Del Rio South, Suite 101
San Diego, CA 92108
Telephone: (619) 233-7770
Facsimile:  (619) 297-1022

**LAW OFFICES OF TODD M. FRIEDMAN, P.C**
Todd M. Friedman (SBN: 216752)
tfriedman@attorneysforconsumers.com
324 S. Beverly Dr. #725
Beverly Hills, CA 90212
Telephone: (877) 206-4741
Facsimile: (866) 633-0228

**JARVIS, KRIEGER & SULLIVAN**
Adam M. Tamburelli (SBN: 301902)
adam@jarvislawyers.com
Charles T. Spagnola, P.C. (SBN: 144983)
charles@jarvislawyers.com
Eliot F. Krieger (SBN: 159647)
Eliot@jarvislawyers.com
444 West Ocean Boulevard, Suite 1700
Long Beach, CA 90802
Telephone:  (562) 597-7070
Facsimile:  (562) 597-7772

**ZIMMERMAN LAW OFFICES, P.C.**
Thomas A. Zimmerman, Jr. (pro hac vice anticipated)
Matthew C. De Re (pro hac vice anticipated)
matt@attorneyzim.com
77 West Washington Street, Suite 1220
Chicago, Illinois 60602
Telephone: (312) 440-0020
Facsimile: (312) 440-4180